# UNITED STATES DISTRICT COURT

## DISTRICT OF SOUTH DAKOTA

### CENTRAL DIVISION



**********************************************************************************

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | * | CR. 11-30113-RAL |
| | * | |
| Plaintiff, | * | |
| | * | **REPORT AND RECOMMENDATION** |
| -vs- | * | **CONCERNING MOTION TO** |
| | * | **SUPPRESS STATEMENTS** |
| PATRICK BROWN THUNDER, | * | |
| | * | |
| Defendant. | * | |
| | * | |

**********************************************************************************

## SUMMARY

A young teenage girl was sexually assaulted on the Cheyenne River Sioux Indian Reservation in 2008. Patrick Brown Thunder was the suspected perpetrator. Federal and tribal investigators talked to Brown Thunder on several occasions during which he made statements. Following his Indictment on sexual abuse and kidnaping charges, Brown Thunder moved to suppress his statements on *Miranda* grounds and under the Fifth and Sixth Amendments. Because the statements were not illegally obtained, the Court recommends that Brown Thunder's suppression motion be denied.

## FACTUAL BACKGROUND

Thirteen-year-old H.C. was sexually assaulted near Dupree, South Dakota the night of March 28-29, 2008. She had been with Brown Thunder, in his car, that night and was intoxicated. She remembered waking up in a field with blood on her shirt and pants, but

could not recall what she and Brown Thunder did before then. Eventually, she was taken to a hospital where a doctor examined her. The doctor noted that she had a two-centimeter laceration, that required stitches, on her right vaginal wall and opined that this injury could have only come from her being penetrated with some kind of object.

Suspecting that Brown Thunder was the culprit of the sexual assault, FBI Agent Daniel Reisig and Larry LeBeau, a detective for the Cheyenne River Sioux Tribe, met with and interviewed Brown Thunder on April 3, 2008. The interview took place in Reisig's SUV, which was parked in front of Brown Thunder's residence. During the first part of the interview, Brown Thunder told officers that he was not even in Dupree when the assault occurred. Later on, he asked whether he needed legal representation. After being told that he was free to go, Brown Thunder agreed to continue the interview and did so in the vehicle. When Reisig asked him for a buccal swab, Brown Thunder declined, got out of the SUV and went back into the residence. Officers then departed, but returned soon afterward, when Brown Thunder, through his sister, contacted them and indicated he was willing to provide a buccal sample. He subsequently consented to officers taking a sample from his mouth. In the process, he mentioned that H.C.'s family was spreading rumors about him. Before leaving, Brown Thunder confirmed that the silver Lincoln Town Car, parked close by, was his. Following this, the interview concluded and Brown Thunder retreated, once again, to the residence.

Almost three years later, on March 24, 2011, FBI Agents Steven Pettyjohn and Megan Breining interviewed Brown Thunder at the Tribal Law Enforcement Center in Eagle Butte.

2

LeBeau was also present for the interview. When questioned about the assault incident, Brown Thunder insisted that he "didn't see anything" and "wasn't there." He agreed to take a polygraph examination and said that the scheduling of one should be made through his sister. Pettyjohn thanked Brown Thunder for coming in and speaking with officers and Brown Thunder left.

The next day, Pettyjohn called Brown Thunder's sister. She put Brown Thunder on the phone and, when asked, he indicated that he was still willing to be polygraphed. Pettyjohn informed Brown Thunder that an examination had been set up for March 29, 2011.

At the appointed time, Brown Thunder appeared for and submitted to a polygraph examination. FBI Agent Mark Sitko administered the examination in a room at the Law Enforcement Center. Before being examined and interviewed, Brown Thunder was advised of his *Miranda* rights and signed a written waiver of them. He also executed a consent form, agreeing to be interviewed with a polygraph. In the pre-test portion of the examination, Brown Thunder denied knowing H.C., her friends or anything about the circumstances surrounding the sexual assault. He said that he "does not go to Dupree" and that H.C. had never been in his car. He likewise indicated that H.C.'s mother had never approached him while he and H.C. were in the car. When specifically asked whether he "insert[ed] anything into that girl's vagina" and whether he had "sex with that girl", he answered "no" both times – answers Sitko believed were deceptive. Upon being told that

3

he had failed the polygraph, Brown Thunder terminated the interview and walked out of the room.

## DISCUSSION

### Brown Thunder's Claims

Brown Thunder claims that his statements to officers, on April 3, March 24, March 25 and March 29, were elicited in violation of *Miranda v. Arizona*[1] and his Fifth and Sixth Amendment rights. He asserts that he was in custody at the time officers questioned him, that his statements were not made voluntarily, and with respect to the March 29 statements, that he did not validly waive his rights before being interrogated.

### April 3 Statements

#### A. Custody

Brown Thunder initially argues that his statements in Reisig's vehicle on April 3 should be suppressed because officers never advised him of his *Miranda* rights. *Miranda* requires that law enforcement officers provide certain warnings before they conduct an interrogation of a suspect who is in custody.[2] Brown Thunder maintains that he was in custody when officers questioned him about H.C. and that he should have received *Miranda* warnings before they did so.

---

[1]384 U.S. 436 (1966).

[2]*See id.* at 478-79.

4

Officers are not required to administer *Miranda* warnings to everyone whom they question.[3] Instead, "warnings are required only where there has been such a restriction on a person's freedom as to render him 'in custody.' It was *that* sort of coercive environment to which *Miranda* by its terms was made applicable, and to which it is limited."[4]

The "ultimate inquiry" in the custody determination "is simply whether there [was] a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest."[5] "Two distinct inquiries are essential to this determination: first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he [ ] was not at liberty to terminate the interrogation and leave."[6] "[T]he critical [question] is not whether the interview took place in a coercive or police dominated environment, but rather whether the [suspect's] 'freedom to depart was restricted in any way.'"[7] "[A]n express advisement that the suspect is not under arrest and that his participation is voluntary" is the most obvious and effective means of demonstrating that custody is lacking.[8] And substantial weight is given to an officer

---

[3]*See Oregon v. Mathiason*, 429 U.S. 492, 495 (1977).

[4]*Id.*

[5]*California v. Beheler*, 463 U.S. 1121, 1125 (1983) (*per curiam*) (internal quotation omitted).

[6]*Thompson v. Keohane*, 516 U.S. 99, 112 (1995) (footnote omitted).

[7]*United States v. LeBrun*, 363 F.3d 715, 720 (8th Cir. 2004) (*en banc*) (*quoting Mathiason*, 429 U.S. at 495), *cert. denied*, 543 U.S. 1145 (2005).

[8]*United States v. Czichray*, 378 F.3d 822, 826 (8th Cir. 2004), *cert. denied*, 544 U.S. 1060 (2005).

advising the suspect that no arrest is being made or will be made at the time of questioning and that the suspect is free to decline to answer questions or to terminate the interview at any time.[9]

Brown Thunder walked, unaided, from his house to Reisig's SUV and got in it. While in the vehicle and before the interview began, Reisig twice informed Brown Thunder that (1) he was not under arrest; (2) his participation in the interview was completely voluntary; and (3) he could end the interview at any time and get out of the vehicle. Brown Thunder did not object to proceeding with the interview and remained in the front seat of the SUV.

While Brown Thunder's movement was somewhat limited (because he was in a vehicle), he was never handcuffed or physically restrained and he was told that the doors to the vehicle were unlocked. Admittedly, officers did drive to Brown Thunder's home and initiated contact with him there. But Brown Thunder agreed to talk to them in the vehicle, as opposed to the home, and did so. The interview did not last long – between 10 and 15 minutes – and Brown Thunder ended it, after being asked to provide a buccal sample, and left without being arrested.

Brown Thunder initiated the second meeting that day. He rejoined officers outside his home and got in the vehicle. Reisig once again advised Brown Thunder that (1) he was not under arrest; (2) he was voluntarily participating in the interview; and (3) he could leave at any time. Reisig also confirmed that Brown Thunder's willingness to provide a

---

[9] *See United States v. Griffin*, 922 F.2d 1343, 1349-50 (8th Cir. 1990).

buccal swab was voluntary and of his own accord. Brown Thunder then permitted officers to take a saliva sample from his mouth, talked briefly with them and went back inside the home.

A couple of observations regarding the meetings should be made. First, *Miranda* warnings are not required simply because the questioning takes place in the closed quarters of a law enforcement vehicle.[10] Second, some degree of coercion is part and parcel of the interrogation process and the coercive aspect of a police interview is largely irrelevant to the custody determination except where a reasonable person would perceive the coercion as restricting his freedom to depart.[11]

On balance, taking into consideration the totality of the circumstances, a reasonable person in Brown Thunder's shoes would not have understood that he was in custody at any time during the two meetings. Hence, officers were not required to warn Brown Thunder of his *Miranda* rights before interviewing him.[12]

---

[10]*See United States v. Plumman*, 409 F.3d 919, 924-25 (8th Cir. 2005); *United States v. Bordeaux*, 400 F.3d 548, 559-60 (8th Cir. 2005); *United States v. Johnson*, 64 F.3d 1120, 1125-26 (8th Cir. 1995), *cert. denied*, 516 U.S. 1139 (1996); *United States v. Iron Hawk*, Nos. CR. 07-30094-01-KES, 2008 WL 3914519 at *5 (D.S.D. Aug. 20, 2008).

[11]*See Mathiason*, 429 U.S. at 495; *see also Stansbury v. California*, 511 U.S. 318, 324-25 (1994) (stating that an officer's suspicion concerning a suspect and purpose for conducting an interview bears upon the custody determination "only if the officer's views or beliefs . . . would have affected how a reasonable person in that position would perceive his [ ] freedom to leave").

[12]*See United States v. Lowen*, 647 F.3d 863, 867-68 (8th Cir. 2011); *Bordeaux*, 400 F.3d at 559-60; 05); *Czichray*, 378 F.3d at 826-30.

## B. Need for Legal Representation

Brown Thunder next argues that Reisig and LeBeau violated his Sixth Amendment right to counsel by continuing to question him after he consulted with them about the need for legal representation. Brown Thunder's argument, however, fails for three independent reasons.

First, no adversary judicial criminal proceedings had been initiated against Brown Thunder at the time of the interviews. His Sixth Amendment right to counsel, therefore, had not attached yet and could not be infringed.[13]

Second, as already discussed, Brown Thunder was not in "custody" at the time he asked officers if he needed legal representation. He had not been arrested and his freedom of action was not curtailed to the point where he was, for all intents and purposes, "under arrest."[14] Consequently, he had no right to counsel under *Miranda* either.[15]

Third, Brown Thunder's cryptic inquiry into whether he needed legal representation was insufficient to invoke his right to counsel. To trigger the right and prevent further

---

[13]*See Plumman,* 409 F.3d at 926-27; *United States v. Red Bird,* 287 F.3d 709, 715-16 (8th Cir. 2002); *see also United States v. Red Bird,* 146 F.Supp.2d 993, 996-1002, 1006-08 (D.S.D. 2001) (discussing when the Sixth Amendment right to counsel attaches in more detail).

[14]*See Beheler,* 463 U.S. at 1125; *Mathiason,* 429 U.S. at 495.

[15]*See United States v. Burket,* 208 F.3d 172, 197 (4th Cir.), *cert. denied,* 530 U.S. 1283 (2000); *see also United States v. Wyatt,* 179 F.3d 532, 537 (7th Cir. 1999) ("the Fifth Amendment right to counsel safeguarded by *Miranda* cannot be invoked when a suspect is not in custody."); *United States v. Bautista,* 145 F.3d 1140, 1147 (10th Cir.) ("Thus, in order to implicate the *Miranda-Edwards* right to counsel prophylaxis, both a custodial situation and an official interrogation are required."), *cert. denied,* 525 U.S. 911 (1998).

interrogation, a suspect must unambiguously request the assistance of counsel.[16] Brown

Thunder's inquiry was not clear enough to alert a reasonable officer that he wanted an

attorney. It was an appeal for advice, not an unequivocal request for counsel.[17]

## C. Voluntariness

Brown Thunder also argues that the statements he made to Reisig and LeBeau were

involuntary. He maintains that his statements were "the product of government

compulsion."[18] The Court disagrees.

The Due Process Clause of the Fifth Amendment "does not mandate that [officers]

forego all questioning, or that they be given cart blanche to extract what they can from a

suspect.[19] The test is one of voluntariness: were the statements to officers "'the product of

an essentially free and unconstrained choice by their maker.'"[20] If so, the suspect has

---

[16]*See Davis v. United States*, 512 U.S. 452, 458-62 (1994).

[17]*See id.* at 459; *Burket*, 208 F.3d 197-98; *see also Mueller v. Angelone*, 181 F.3d 557, 573-74 (4th Cir.) (inquiry "Do you think I need an attorney here?"), *cert. denied*, 527 U.S. 1065 (1999); *State v. Walker*, 276 Kan. 939, 947, 80 P.3d 1132, 1138 (2003) ("Do I need a lawyer?"); *Commonwealth v. Scoggins*, 439 Mass. 571, 575, 789 N.E.2d 1080, 1083 (2003) (defendant's asking an officer if he needed an attorney); *State v. Barrera*, 130 N.M. 227, 236, 22 P.3d 1177, 1186 (2001) (defendant's question, "Do I need an attorney?"); *State v. Dumas*, 750 A.2d 420, 424 (R.I. 2000) ("The statement 'Do I need a lawyer?'"); *State v. Bucklew*, 973 S.W.2d 83, 90-91 (Mo. 1998) ("Well, do you think I should have an attorney present?"), *cert. denied*, 525 U.S. 1082 (1999); *State v. Greybull*, 579 N.W.2d 161, 163-64 (N.D. 1998) ("Do I need to get a lawyer?").

[18]Dkt. No. 59 at p. 1.

[19]*Schneckloth v. Bustamonte*, 412 U.S. 218, 225 (1973).

[20]*Id.* (quoting *Culombe v. Connecticut*, 367 U.S. 568, 602 (1961)).

"willed to confess,'" or at least agreed to uninhibitedly speak with officers, and his statements may be used against him.[21] If not, "'the use of his [statements] offends due process.'"[22] In considering the voluntariness of a suspect's statements, the dispositive question is whether they were obtained by "threats, violence, or express or implied promises sufficient to overbear the [suspect's] will and critically impair his capacity for self-determination."[23] When deciding this question, a court must look to the totality of the circumstances, including the "conduct of the officers and the characteristics of the [suspect]."[24] The burden of persuasion rests with the Government and it must prove voluntariness by a preponderance of the evidence.[25]

There is no proof – worthy of belief – that Brown Thunder was coerced into making statements or that his decision to twice meet with and talk to officers on April 3 was the product of anything other than his own decision. Reisig informed Brown Thunder, on three separate occasions, that the interviews were voluntary and that he could end them and leave whenever he wanted. At no time did officers ever make any threats or promises to Brown Thunder. Nor did they yell and point fingers at him or accuse him of anything. The duration, tone and overall atmosphere of the interviews were not hostile or

---

[21]*Id.*

[22]*Id.* at 225-26.

[23]*LeBrun*, 363 F.3d at 724.

[24]*Id.*

[25]*See Missouri v. Seibert*, 542 U.S. 600, 608, n. 1 (2004); *LeBrun*, 363 F.3d at 724.

intimidating. Brown Thunder cooperated with officers – agreeing to meet with them two different times and providing them with a buccal sample – and proclaimed that he was not even in Dupree when the sexual assault took place. While with officers, Brown Thunder was not under the influence of alcohol or drugs and nothing he said or did indicated that he suffered from any kind of cognitive impairment. Considering all the factors relevant to the voluntariness probe, the Government has established, by a preponderance of the evidence, that Brown Thunder's statements were voluntary.[26]

### March 24 Statements

Brown Thunder further contends that statements he made, to Pettyjohn, Breining and LeBeau on March 24, were custodial and coercive. His contention is based on the custody aspect of *Miranda* – that a person is entitled to be warned of his rights before being subjected to custodial interrogation – and on the voluntariness component of the Fifth Amendment – that statements, to be admissible, must be voluntarily given – and seeks to suppress all of the statements he made that day.

## A. Custody

At LeBeau's request, Brown Thunder came to the Law Enforcement Center. There, he met with officers in an inner conference room. Pettyjohn advised Brown Thunder that he was not under arrest, that anything he wanted to talk about was voluntary and that he was free to leave the room at any time he wished. Brown Thunder responded to questions

---

[26]*See Plumman*, 409 F.3d at 924-25; *Bordeaux*, 400 F.3d at 560-61.

asked of him, agreed to set up a polygraph examination and then left 5 to 10 minutes later.

Whatever coercion may have existed by virtue of the interview locale and the number of officers present was not the sort that a reasonable person, in Brown Thunder's position, would have viewed as encumbering his ability to depart. Brown Thunder was never physically restrained or placed in handcuffs. Pettyjohn advised Brown Thunder that he could leave at any time. And ultimately, Brown Thunder exited the Center without being arrested.[27]

This case is largely indistinguishable from Supreme Court cases involving station house questioning.[28] Brown Thunder was not under arrest, or its functional equivalent (because his freedom of movement was restricted), at the time of the interview. This being the case, he has no room to complain about any unwarned questioning.[29]

## B. Voluntariness

Nor can Brown Thunder justifiably carp about the voluntariness of his statements that day. His interview was very short, lasting no more than 10 minutes. Only two or

---

[27]*See United States v. Galceran*, 301 F.3d 927, 931 (8th Cir. 2002) (observing that the lack of arrest was a "very important factor weighing against custody").

[28]*See United States v. Muhlenbruch*, 634 F.3d 987, 995-97 (8th Cir.), *cert. denied*, 132 S.Ct. 228 (2011); *LeBrun*, 363 F.3d at 721-23; *see also Thatsaphone v. Weber*, 137 F.3d 1041, 1044-45 (8th Cir.) (defendant came to the police department on his own, was told he was not under arrest, that the interview was voluntary and that he was free to leave and then left without hindrance after a short interview), *cert denied*, 523 U.S. 1130 (1998).

[29]*See United States v. Black Bear*, 422 F.3d 658, 661-63 (8th Cir. 2005); *United States v. Brave Heart*, 397 F.3d 1035, 1038-48 (8th Cir. 2005); *Galceran*, 301 F.3d at 929-31; *United States v. Betone*, 686 F.Supp.2d 949, 952-54 (D.S.D. 2010).

12

three minutes of the interview pertained to H.C.'s sexual assault and he told officers three things: "I didn't see anything", "I was not there" and "They didn't see anything." He was 29 years old at the time and did not appear to have any difficulty comprehending the questions asked of him or responding to them. What he said was both logical and understandable. He was also sober – free of alcohol and drugs – when he spoke to officers. And he recognized that the interview was voluntary and that he had the option of leaving at his discretion – an option he ultimately exercised.

In the final analysis, Brown Thunder's statements were voluntary and did not emanate from coercive interrogation or arm-twisting on the part of officers.[30] Because officers took no action that, objectively speaking, was troublesome and should be penalized, there is nothing to refute the voluntariness of these statements. The Government has met its burden and the statements may be used at trial.

### March 25 Statements

Brown Thunder's *Miranda* and voluntariness claims, regarding his conversation with Pettyjohn on March 25, can be disposed of in short order.

The conversation took place on the telephone, and while Brown Thunder was at home. His "freedom was not restricted in any way whatsoever"[31] when he spoke to

---

[30]*See Muhlenbruch*, 634 F.3d at 997-98; *LeBrun*, 363 F.3d at 726-27; *Galceran*, 301 F.3d at 931.

[31]*See Beheler*, 463 U.S. at 1123.

13

Pettyjohn.   And he was not arrested until five months later.  His custody claim is wholly without merit.

So too is his voluntariness claim. Pettyjohn asked Brown Thunder only one question during their conversation, namely, whether Brown Thunder "was still willing to take the polygraph."[32]  Brown Thunder responded by saying he was.[33]  Pettyjohn then told Brown Thunder when the polygraph had been scheduled.[34]  This brief and innocuous exchange was neither coercive nor overbearing and did not come anywhere close to the prohibited line.

### March 29 Statements

Brown Thunder was interviewed again at the Law Enforcement Center on March 29. He seeks to suppress his statements because they were obtained in violation of *Miranda* and because they were not made voluntarily.

### A. Custody

Having considered relevant Supreme Court and Eighth Circuit precedent in light of the record now before it, the Court is unable to conclude that Brown Thunder was in "custody" so as to trigger the protections of *Miranda*. His statements to Sitko were made after he was advised of his *Miranda* rights and waived them.  He appeared to appreciate

---

[32]Mot. Hrg. Tr. at 74 (Sept. 4, 2012).

[33]*See id.*

[34]*See id.*

the situation he was in and was informed that he was not under arrest or in custody and that he was free to leave at any moment. Although his freedom of movement was somewhat restricted (because he was questioned in a closed room and hooked up to the polygraph instrument for a period of time), he was not shackled or otherwise restrained in a manner akin to a formal arrest. He agreed to meet with Sitko for a polygraph examination and appeared, by himself, at the designated time for it. No rubber hose machinations or artifices were used to extract statements from him and the interview/examination was straight forward and not protracted. Notably, when the examination was over and he was advised that he failed it, Brown Thunder terminated the interview and departed. Under these circumstances, Brown Thunder was not in "custody" and entitled to *Miranda* warnings.[35]

## B. Voluntariness

At the outset, it should be pointed out that "[c]ases in which a defendant can make a colorable argument that a self-incriminating statement was 'compelled' despite the fact that law enforcement authorities adhered to the dictates of *Miranda* are rare."[36] That is not to say that compliance with *Miranda* conclusively establishes the voluntariness of later

[35]*See McDowell v. Leapley*, 984 F.2d 232, 234 (8th Cir. 1993); *Jenner v. Smith*, 982 F.2d 329, 334-35 (8th Cir.), *cert. denied*, 510 U.S. 822 (1993); *United States v. Bad Hand*, 926 F.Supp. 891, 897-98 (D.S.D. 1996); *compare Black Bear*, 422 F.3d at 663.

[36]*Dickerson v. United States*, 530 U.S. 428, 444 (2000) (*quoting Berkemer v. McCarty*, 468 U.S. 420, 433, n. 20 (1984)).

made statements.[37] Brown Thunder's pre-interview/examination *Miranda* advisements though make it much more difficult for him to rebut the Government's assertion that his statements to Sitko were voluntary.

Throughout the interview, Brown Thunder denied any criminal culpability. He steadfastly maintained that he did not know H.C., had not been with her the night she was sexually assaulted and was not even in Dupree that night. Whatever Sitko may have said or done to obtain inculpatory admissions from Brown Thunder was not successful, and most certainly did not overbear Brown Thunder's will.

In any event, the requisite coercive or overreaching conduct sufficient to render Brown Thunder's statements involuntary was lacking. Several facts support this conclusion.

Brown Thunder was not threatened, promised or forced to do anything. Sitko never raised his voice or called Brown Thunder a liar. Nor did Sitko ever brandish a weapon or intimidate Brown Thunder in any way. Brown Thunder's age, education, background and conduct that day do not indicate that he was low functioning or that he was particularly suggestible and vulnerable to questioning by authority figures (i.e. could be talked into anything). His decision to end the interview and leave, when told that he did not pass the polygraph, demonstrates that he had the wherewithal and fortitude to withstand both the stressors of the moment and the temptation to give in and confess. And Brown Thunder's responses to inquiries convincingly establish that he was not under the influence of alcohol

---

[37]*See Berkemer*, 468 U.S. at 433, n. 20.

16

or drugs while with Sitko. They likewise show that he was not suffering from any mental or physical afflictions during the interview/examination.

It was not improper for Sitko to inform Brown Thunder that he failed the polygraph examination or to ask follow up questions after the adverse examination results were disclosed.[38] Nor was it impermissible to attempt to evoke further statements from Brown Thunder by questioning his denial of salient facts.[39] Numerous cases have held that "suggestive" questioning techniques will not render a suspect's admissions involuntary unless the overall impact of the interrogation caused the suspect's will to be overborne.[40] "[T]here is nothing inherently wrong with efforts to create a favorable climate for confession."[41] As the Supreme Court adeptly observed some time ago, "very few people give incriminating statements in the absence of official action of some kind."[42]

The fact that Brown Thunder's statements were made during and in connection with a polygraph examination is of little, if any, significance because the circumstances present, when considered *in toto*, plainly establish that the statements were made voluntarily.[43]

---

[38]*See Jenner*, 982 F.2d at 334.

[39]*See id.*

[40]*See id. (citing cases); United States v. Makes Room For Them*, 49 F.3d 410, 415 (8th Cir. 1995).

[41]*Jenner*, 982 F.2d at 334 *(quoting Hawkins v. Lynaugh*, 844 F.2d 1132, 1140 (5th Cir.), *cert. denied*, 488 U.S. 900 (1988)).

[42]*Schneckloth*, 412 U.S. at 224.

[43]*See Wyrick v. Fields*, 459 U.S. 42, 47-49 (1982), *on remand*, 706 F.2d 879, 880-82 (8th Cir.), *cert. denied*, 464 U.S. 1020 (1983); *Black Bear*, 422 F.3d at 664-65; *Jenner*, 982 F.2d at
(continued...)

17

Brown Thunder's statements were voluntary and not the result of coercive interrogation on the part of Sitko. Brown Thunder was read his *Miranda* rights, waived them and made unconstrained statements to Sitko. Brown Thunder was fully in control of his faculties and was not swayed by the power and influence of the polygraph device or the FBI agent running it.[44]

## C. Waiver

Even if he was in custody at the time of the interview with Sitko (so that *Miranda* warnings were required), Brown Thunder nonetheless waived his rights and agreed to answer questions without a lawyer present.

The inquiry into whether a waiver is valid or has been coerced has "two distinct dimensions."[45] First, the relinquishment of the *Miranda* rights must be voluntary, that is, it must be the product of a free and deliberate choice, rather than intimidation, coercion or

---

[43](...continued)
333-34; *Vassar v. Solem*, 763 F.2d 975, 977-78 (8th Cir. 1985); *United States v. Iron Thunder*, 714 F.2d 765, 771-72 (8th Cir. 1983); *United States v. Jackson*, 712 F.2d 1283, 1285-86 (8th Cir. 1983); *United States v. Eagle Elk*, 711 F.2d 80, 81-83 (8th Cir. 1983), *cert. denied*, 465 U.S. 1013 (1984); *see also United States v. Scares The Hawk*, 683 F.Supp.2d 1036, 1037-42 (D.S.D. 2009); *United States v. Dupris*, 422 F.Supp.2d 1061, 1066 (D.S.D. 2006); *United States v. Black Spotted Horse*, 120 F.Supp.2d 802, 807-08 (D.S.D. 2000); *Bad Hand*, 926 F.Supp. at 901-02.

[44]*See LeBrun*, 363 F.3d at 726-27; *United States v. Astello*, 241 F.3d 965, 966-68 (8th Cir. 2001); *Makes Room For Them*, 49 F.3d at 415.

[45]*Moran v. Burbine*, 475 U.S. 412, 421 (1986) (*citing Edwards v. Arizona*, 451 U.S. 477 (1981)).

18

deception.[46] Second, the waiver must be made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.[47] Only if the totality of the circumstances surrounding the interrogation reveal both an uncoerced choice and requisite level of comprehension may a court properly conclude that the rights have been waived.[48]

The voluntariness prong of this inquiry has already been determined. The Court thus is left only with the task of ascertaining whether Brown Thunder's waiver was "knowing" and "intelligent."

Brown Thunder was advised of his *Miranda* rights and waived these rights in writing before being questioned. The written waiver itself constitutes strong evidence that he had a clear understanding of his rights and intended to and did give them up.[49] What's more, his execution of the consent to interview with polygraph form along with what he said and did during the course of the interview weigh heavily in favor of a valid waiver. And so do the detailed explanations Sitko provided to Brown Thunder of what mental duress meant and what the polygraph was all about. Based on the entirety of the record, there can be

---

[46]*See id.*

[47]*See id.*

[48]*See id.; see also Colorado v. Spring,* 479 U.S. 564, 573 (1987); *North Carolina v. Butler,* 441 U.S. 369, 274-75 (1979).

[49]*See Butler,* 441 U.S. at 373 ("an express written . . . statement of waiver of the right to remain silent or the right to counsel is usually strong proof of the validity of that waiver. . .").

19

little doubt that Brown Thunder knowingly and intelligently waived his *Miranda* rights before being questioned and making remarks to Sitko.

It does not matter that Brown Thunder's statements were made in response to questions asked of him during the polygraph examination. By agreeing to submit to the polygraph, Brown Thunder consented to questioning and waived not only his right to be free of contact with law enforcement authorities in the absence of an attorney but also his right to be free of interrogation about the crime (of sexually assaulting H.C.) he was suspected of having committed.[50] Regardless of what Brown Thunder's anticipations were concerning the examination and the questions he would be asked, it would have been unreasonable for him to assume that he would not be informed of the polygraph readings and asked to explain any unfavorable results.[51] Importantly, Brown Thunder was told that he could have a lawyer present with him while being questioned and that he could stop the questioning at any time.[52] Merely disconnecting the polygraph equipment would not remove this knowledge from his mind.[53]

It is plain from the record that Brown Thunder fully understood and expressly waived his rights before being interviewed and submitting to the polygraph examination.

---

[50]*See Fields,* 459 U.S. at 47, *on remand,* 706 F.2d 879, 881-82; *Eagle Elk,* 711 F.2d at 82-83.

[51]*See Fields,* 459 U.S. at 47, *on remand,* 706 F.2d at 881.

[52]*See id.* at 47-48.

[53]*See id.* at 47; *see also Vassar,* 763 F.2d at 978; *Eagle Elk,* 711 F.2d at 83.

20

This waiver was made after he voluntarily, knowingly and intelligently relinquished his rights.

## CONCLUSION

Officers did not violate the dictates of *Miranda* or Brown Thunder's Fifth and Sixth Amendment rights so as to require the suppression of his statements. He willingly participated in interviews with officers and cooperated with them. His *Miranda* and constitutional rights were adhered to and his statements to officers were voluntary. No basis exists to exclude the statements. His suppression motion should, in the end, be denied.

## RECOMMENDATION

Accordingly, it is hereby

RECOMMENDED that Brown Thunder's Motion to Suppress Statements[54] be denied in its entirety for the reasons stated herein.

## NOTICE

An aggrieved party must file written objections, within 14 calendar days, to challenge this Report and Recommendation before the assigned United States District Judge.[55]

---

[54]*See* Dkt. No. 58.

[55]*See* 28 U.S.C. §636(b)(1).

Dated this 22nd day of October, 2012, at Pierre, South Dakota.

BY THE COURT:

MARK A. MORENO
UNITED STATES MAGISTRATE JUDGE